289 So.2d 832 (1974)
HARRIS W. HALL COMPANY, INC.
v.
SECURITY INSURANCE COMPANY.
No. 5989.
Court of Appeal of Louisiana, Fourth Circuit.
February 6, 1974.
Pilie, Pilie & Landry, M. Arnaud Pilie, New Orleans, for plaintiff-appellee.
Francipane, Regan & St. Peé, Chester Francipane, Metairie, for defendant-appellant.
Before STOULIG and BOUTALL, JJ. and MARCEL, J. Pro Tem.
*833 CLEVELAND J. MARCEL, Sr., Judge Pro Tem.
From a judgment of the trial court determining that a $10,000.00 Commercial Blanket Bond issued to Harris W. Hall Company, Inc., insuring against loss through dishonest acts of employees afforded indemnity to the insured to the full extent of the coverage, Security Insurance Company has appealed.
Security contends that the theft losses sustained by Harris W. Hall Company, Inc., were not covered under the terms of the bond itself in that Hall failed to prove the loss except by means of inventory and that the Hall Company is further disqualified for coverage because Mr. Harris Hall had knowledge or information that the guilty employee was engaged in continuous acts of theft.
The pertinent sections of Security's bond are as follows:
"Section 6. The coverage of this bond shall not apply to any employee from and after the time that the Insured or any partner or officer thereof not in collusion with such employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured."
"Section 2. This bond does not apply to loss, or to that part of any loss, as the case may be, the proof of which, either to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees."
The evidence revealed that from a period beginning approximately in the late summer of 1966 until March, 1967, a warehouse employee of Harris W. Hall Co. (Alfred Dorest) engaged in systematic acts of theft. Dorest's co-worker, Willie Henderson, testified that he personally observed Dorest load onto customer's trucks boxes of items that were neither ordered nor recorded as sold, and that Dorest did so on a regular basis (2 or 3 times weekly.) Henderson testified that Dorest would twice weekly give out boxes of merchandise to a certain man and woman who would walk up to the loading dock and carry the items away. He further witnessed (several times weekly) the exchange of money from truck drivers and other customers, and Henderson knew that no cash business was transacted in the organization. Henderson did not tell the boss of these thefts because he lived in the same housing project as Dorest's friends and feared for his personal safety. Dorest was arrested in March of 1967 in the act of receiving approximately $600.00 for stolen merchandise.
Mike Cefolia, who worked at a neighboring competitor business, testified that he sent one of his customers to Harris W. Hall Company to pick up a part for an air conditioner, since his own stock of that part was temporarily depleted, and the customer drove away from Harris Hall with an entire air conditioning unit on his truck. Cefolia called Mr. Hall to complain about this incident, but Hall believed Cefolia was mistaken about the truck; that is, Hall believed it was one of Harris Hall Co.'s customers who bought the air conditioner. Hall and Cefolia argued but neither accepted the other's version of the incident. Apparently, both were correct Harris Hall had sold one unit to his customer and Alfred Dorest had sold another unit to Cefolia's customer. Dorest, however, sold the $895.00 unit for $150.00 cash.
Three weeks before Dorest's arrest, in early 1967, a detective spoke to Hall on a Monday morning shortly before Hall was to leave on one of his regular business trips. The detective told Hall that he had information that his merchandise was *834 being sold all over the city, and that for so many dollars a day the detective would conduct an investigation. Hall told him he would get back to him laterhe then asked the warehouse manager if there had been any shortages appearing lately. The manager told him that there were no shortages nor any suspicious activities occurring. Two weeks later, having returned from the trip, Hall personally checked and found shortages. He asked the manager if he had taken inventory. The manager replied that he had not, whereupon he and Hall argued, the two came to blows, and Hall fired him. On the Monday following this fight, Alfred Dorest was caught in the act of selling stolen Hall Co. merchandise and was arrested.
Security contends that Hall knew or should have known that thefts were taking place from the time of the sale of the air conditioner, and certainly from the time he was approached by the detective. Hall contends that he did not believe Cefolia about the air conditioner and therefore had no reason to suspect thievery. When approached by the detective, Hall relied on his manager, who told him everything was alright. The trial judge resolved the conflict in favor of Hall. Hall may have been wrong to put his trust in his manager, who covered up his failure to take inventory by assuring Hall that there were no shortages, but Hall's mistaken trust does not constitute knowledge of the thefts, just as his error in believing the air conditioning unit to have been sold to his own customer does not constitute, in the language of the Bond, "knowledge or information that (an) Employee has committed any fraudulent or dishonest act in the service of the Insured." We find no error in the finding of the trial judge that Hall did not have knowledge of the thefts, until shortly before Dorest was arrested, by which time virtually all but the last few of Dorest's thefts had taken place.
Security next contends that because Hall's manager had been so lax in his duty of taking inventory, there could be no real proof that the missing merchandise was stolen; i. e., the losses could just as easily have resulted from poor bookkeeping as from theft. Henderson's testimony, however, was that Dorest's dishonest activities occurred several times a week and that on each occasion he gave out boxes of merchandise, each of which could have been worth (according to Hall) $25.00, $40.00, $60.00 or $100.00 or more. At the time of his arrest Dorest was collecting $600.00 for one haul of goods. Based on these facts, the trial judge concluded that at least ten thousand dollars worth of the $23,035.71 in shortages was due to theft. There can be no doubt that Hall proved the factual existence of theft; Security contends that it is the amount that has not been proven. We conclude that due to the prolonged frequency of Dorest's activities and the relatively high value of each of the items stolen (a few of which exceeded $500.00), that Dorest had taken in excess of $10,000.00 in merchandise. In effect, the trial court ruled that Hall had met the burden of proof as to the amount imposed by Section 2 of the Bond. We cannot disagree.
We therefore affirm the judgment of the trial court that Security Insurance Company is liable to the full extent of the Bond, $10,000.00.
Affirmed.